April Marie SCHULTZEN, Individually and on Behalf of Others Similarly Situated, Plaintiffs,

v.

WOODBURY CENTRAL COMMUNITY SCHOOL DISTRICT and Larry Bumsted, Individually and in his Official Capacity, Defendants.

No. C01–4089–MWB.

United States District Court, N.D. Iowa, Western Division.

Feb. 22, 2002.

MEMORANDUM OPINION AND OR-
DER REGARDING DEFENDANT
WOODBURY CENTRAL COMMU-
NITY SCHOOL DISTRICT'S MO-
TION TO DISMISS

BENNETT, Chief Judge.

## TABLE OF CONTENTS

I.   *INTRODUCTION* ...................................................1101

II.  *LEGAL ANALYSIS* ................................................1103
     A.  *Standard Governing 12(b)(6) Motion To Dismiss* .........................1103
     B.  *The School District's Motion* ...............................................1104
         1.  *Punitive damages under section 1983 and Chapter 216* ...............1104
         2.  *Availability of punitive damages in general under Title IX* ...........1104
         3.  *Can a prevailing plaintiff recover punitive damages against a*
             *school district under Title IX?* ...................................1109
             a.  *The common-law tradition of municipal immunity:* City of
                 Newport v. Fact Concerts, Inc. ................................1109
             b.  Newport's *analytical framework: Two-part inquiry* ..............1109
             c.  *The common-law tradition of the availability of all remedies:*
                 Frankin v. Gwinnett County ...................................1112

d.   *Reconciling* Franklin *with* Newport . . . . . . . . . . . . . . . . . . . . . . . . . . . 1113
e.   **District courts' treatment of Title IX, municipal entities, and**
     **punitive damages: An overview** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1114
f.   **Step one:** Newport *as the starting point* . . . . . . . . . . . . . . . . . . . . . . . 1122
g.   **Step two: Public policy considerations** . . . . . . . . . . . . . . . . . . . . . . . 1122
h.   Newport *as the ending point* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1125

III.  *CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1128

This case presents a fundamental question under Title IX: whether punitive damages are available against a school district for alleged violations of Title IX. No court of appeals has addressed this issue; and, while a handful of district courts have undertaken the task of resolving this question, a consensus has not been reached. The crux of the matter necessitates reconciling two well-established common-law traditions. Under one tradition, local governmental entities are immune from awards of punitive damages. Under the other tradition, once a cause of action has been recognized, any appropriate remedies, including punitive damages, are presumptively available. In order to resolve the question raised in this motion to dismiss, the court must give due weight to these traditions, examine the scant legislative history of Title IX and its predecessor, Title VI, explore the contours of public policy, and ultimately discern congressional intent. In the final analysis, this case presents a "close call," but, in the end, the stronger of the two traditions must prevail, at least until Congress speaks on this issue.

## I.   INTRODUCTION

This matter is before the court on defendant Woodbury Central Community School District's Motion To Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).[1] In this civil rights action, the plaintiff ("Schultzen") asserts four counts of discrimination. Count I alleges violation of Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681 *et seq.*, against defendant Woodbury Central Community School District for alleged discriminatory treatment of females in the school system. Count II avers constitutional violations against both defendants, which Schultzen seeks to vindicate vis-a-vis 42 U.S.C. § 1983. Count III similarly alleges the defendants violated Schultzen's constitutional rights. However, Count III asserts a state-law claim pursuant to the Iowa Civil Rights Act, Iowa Code Chapter 216. Finally, on behalf of a class of other women against whom the defendants have allegedly discriminated based on their gender, Count IV of Schultzen's complaint requests that this court certify this litigation as a class action.[2]

Because this motion to dismiss presents purely legal issues, the underlying facts of the litigation are not pertinent. However, in order to contextualize this motion, the court will engage in a brief synopsis of the facts.[3]

---

1.   The plaintiff is represented by Stanley E. Munger and Jay E. Denne of Munger, Reinschmidt & Denne, Sioux City, Iowa. The defendant Woodbury Central Community School District is represented by Michael J. Frey of Hellige, Lundberg, Meis, Erickson & Frey, Sioux City, Iowa. The defendant Larry Bumsted did not participate in this motion to dismiss, but for the sake of completeness, the court notes that he is represented by Douglas

L. Phillilps of Klass Stoik Mugan Villone & Phillips, L.L.P., Sioux City, Iowa.

2.   The court notes that, while the complaint asserts a class action, the plaintiff has not moved the court to certify the class.

3.   In its recitation of the facts, the court is, however, required to view all factual allegations alleged in the complaint as true and will draw all reasonable inferences in favor of the

April Marie Schultzen ("Schultzen") was a student-athlete in the Woodbury Central Community School District system. The defendants in this action are the Woodbury Central Community School District ("the school district") and Larry Bumsted ("Bumsted"). Bumsted is employed as a police officer for the City of Moville, Iowa, and Schultzen has sued him in both his individual and official capacities.

On September 9, 2000, defendant Bumsted, a local law enforcement officer, observed Schultzen, who was eighteen years of age at the time, smoking a cigarette at the Conoco convenience store in Moville, Iowa. After inquiring whether Schultzen was involved in any interscholastic athletic activities and learning that Schultzen was a member of the women's volleyball team, Bumsted reported the incident to Mr. Wisniewski, the principal of the Woodbury Central high school. On September 12, 2000, Mr. Wisniewski confronted Schultzen with Bumsted's allegation that he observed her smoking. Because smoking violated the school district's "Good Conduct Code," Schultzen was suspended from all extra-curricular activities for a period of six weeks. The situation worsened for Schultzen when, on September 12, 2000, her mother questioned Mr. Wisniewski about the suspension and was informed that the suspension had been increased to twelve weeks because Schultzen was a repeat offender, having previously violated the school district's Good Conduct Code. The school board affirmed the suspension on September 25, 2000.

In her complaint, Schultzen avers that female athletes are treated more severely for violating the school district's Good Conduct Code than are similarly situated male athletes. Specifically, she contends that male students with similar or worse violations of the Good Conduct Code are treated substantially better than are female students. To support her argument, Schultzen points to the school district's alleged treatment of a male football player. According to Schultzen, the male student violated the Good Conduct Code on three separate occasions. On one occasion in particular, a police officer apprehended this individual for drinking alcohol. The officer issued the student a citation for being a minor in possession of alcohol, but the school board did not suspend him from participating in extra-curricular activities, ostensibly because he was on private property at the time he was caught drinking.

The school district moved to dismiss portions of Schultzen's complaint on the ground that portions of the complaint fail to state a claim upon which relief can be granted. Namely, the school district asserts that Schultzen's punitive damage claims are not cognizable under Title IX, section 1983, nor under Chapter 216 as against the school district. First, the school district contends that it is immune as a matter of law from an award of punitive damages under section 1983. Second, the school district maintains that punitive damages cannot be assessed against governmental entities, including public school districts, under Title IX. And last, the school district asserts that Chapter 216 of the Iowa Civil Rights Act does not provide for the recovery of punitive damages.

Schultzen filed a resistance on November 5, 2001. However, she agreed that punitive damages are not available against defendant Woodbury Central Community School District under either 42 U.S.C. § 1983 or Chapter 216 of the Iowa Civil Rights Act. Schultzen did not, therefore, resist those portions of the defendant's motion.

However, she did resist the defendant's assertion that Title IX does not provide for

plaintiff. *E.g., Whitmore v. Harrington,* 204 F.3d 784, 784 (8th Cir.2000).

an award of punitive damages against a public school district because no court of appeals has of this date decided that issue. Schultzen asserts that she has pled sufficient facts to support a finding of ongoing violations by the defendants, which would allow for an award of punitive damages. Accordingly, she requests that the court deny the defendant's motion to dismiss.

## II. LEGAL ANALYSIS

### A. Standard Governing 12(b)(6) Motion To Dismiss

Federal Rule of Civil Procedure 12(b)(6) provides:

> (b) Every defense, in law or fact, to a claim for relief in any pleading, whether a claim, counterclaim, cross-claim, or third-party claim, shall be asserted in the responsive pleading thereto if one is required, except that the following defenses may at the option of the pleader be made by motion: ... (6) failure to state a claim upon which relief can be granted....

FED. R. CIV. P. 12(b)(6).

"A dismissal under Federal Rule of Civil Procedure 12(b)(6) is essentially a ruling on a question of law." *North Star International v. Arizona Corp. Comm'n,* 720 F.2d 578, 580 (9th Cir.1983) (citing *Yuba Consolidated Gold Fields v. Kilkeary,* 206 F.2d 884, 889 (9th Cir.1953)). In considering a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6), the court must "accept the complaint's factual allegations as true and construe them in the light most favorable to [the plaintiff]." *Whitmore v. Harrington,* 204 F.3d 784, 784 (8th Cir.2000); *accord Cruz v. Beto,* 405 U.S. 319, 322, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972); *Anderson v. Franklin County, Mo.,* 192 F.3d 1125, 1131 (8th Cir.1999); *Gross v. Weber,* 186 F.3d 1089, 1090 (8th Cir.1999); *Midwestern Mach. v. Northwest Airlines, Inc.,* 167 F.3d 439, 441 (8th Cir.

1999); *Valiant–Bey v. Morris,* 829 F.2d 1441, 1443 (8th Cir.1987). A complaint should be dismissed under Rule 12(b)(6) only if, taking the allegations as true, "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); *Knapp v. Hanson,* 183 F.3d 786, 788 (8th Cir.1999) ("A motion to dismiss should be granted only if 'it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him to relief.'") (quoting *Morton v. Becker,* 793 F.2d 185, 187 (8th Cir.1986), and citing *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). This court also observes that a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) does not test whether the plaintiff will prevail on the merits, but rather tests whether the plaintiff has properly stated a claim upon which relief can be granted. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

Furthermore, pertinent to this 12(b)(6) motion, the court is mindful that in treating the factual allegations of a complaint as true pursuant to Rule 12(b)(6), the court must "reject conclusory allegations of law and unwarranted inferences." *Silver v. H & R Block, Inc.,* 105 F.3d 394, 397 (8th Cir.1997) (citing *In re Syntex Corp. Securities Lit.,* 95 F.3d 922, 926 (9th Cir.1996)); *Westcott v. City of Omaha,* 901 F.2d 1486, 1488 (8th Cir.1990) (the court "do[es] not, however, blindly accept the legal conclusions drawn by the pleader from the facts," citing *Morgan v. Church's Fried Chicken,* 829 F.2d 10, 12 (6th Cir.1987), and 5 CHARLES A. WRIGHT AND ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1357, at 595–97 (1969)); *see also LRL Properties v. Portage Metro Hous. Auth.,* 55 F.3d 1097, 1103 (6th Cir.1995) (the court "need not accept as true legal conclu-

sions or unwarranted factual inferences," quoting *Morgan*, 829 F.2d at 12). Conclusory allegations need not and will not be taken as true; rather, the court will consider whether the facts alleged in the complaint, accepted as true, are sufficient to state a claim upon which relief can be granted. *Silver*, 105 F.3d at 397; *Westcott*, 901 F.2d at 1488.

### B. The School District's Motion

#### 1. Punitive damages under section 1983 and Chapter 216

The court agrees with the parties that an award of punitive damages is not available against the school district under either section 1983 or Chapter 216. *Compare City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981) ("[A] municipality is immune from punitive damages under 42 U.S.C. § 1983."), *with Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 738, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989) (stating public school districts are considered municipal entities); *see Schwarz v. Northwest Iowa Cmty. College*, 881 F.Supp. 1323, 1338–40 (N.D.Iowa 1995) (recognizing "[t]he Iowa Supreme court has consistently rejected the argument that [Chapter 216] authorize[s] punitive damages."); *Smith v. ADM Feed Corp.*, 456 N.W.2d 378, 382–83 (Iowa 1990) (holding that neither courts nor administrative agencies are authorized to award punitive damages under the Iowa act). Therefore, the court will grant the school district's motion to dismiss Schultzen's claims for punitive damages against the school district under Counts II (§ 1983) and III (Chapter 216) of her complaint.

#### 2. Availability of punitive damages in general under Title IX

▮▮▮ The school district also seeks dismissal of Schultzen's claim for punitive damages on the ground that punitive damages are not available against the school district under Title IX. Title IX provides in pertinent part: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance...." 20 U.S.C. § 1681 (2000). Under Title IX, an educational entity receiving federal funding may be held liable if students suffer discriminatory treatment, and the United States Supreme Court has recognized that Title IX provides for an implied private cause of action. *See Cannon v. University of Chicago*, 441 U.S. 677, 717, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979). Monetary damages are also available for violations of Title IX. *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 633, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999); *Franklin v. Gwinnett County Pub. Schs.*, 503 U.S. 60, 74–75, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992).

However, neither the Supreme Court nor the Eighth Circuit, nor any other circuit court for that matter,[4] has determined whether punitive damages are recoverable in a Title IX action against municipal entities. In addition, this court was unable to locate any Northern District of Iowa decisions regarding the issue of municipal exposure to punitive damages under Title IX. This court did uncover one Southern District of Iowa case in which the court dis-

---

**4.** The Seventh Circuit has stated in dicta, albeit without legal citation or discussion, that punitive damages are available under Title IX in an action against a public school system. *See Waid v. Merrill Area Pub. Schs.*, 91 F.3d 857, 862 (7th Cir.1996) (reasoning that Title

IX claim against school district preempts plaintiff's § 1983 claim against school officials because "[b]oth statutes prohibit the same kind of conduct and provide compensatory and punitive damages as remedies for that conduct").

missed the plaintiff's claim for punitive damages against the defendant school district on the ground the school district was immune from an award of punitive damages under Title IX. *See Murphy v. Pleasantville Sch. Dist.*, 2000 WL 33361989, at *7 (S.D.Iowa May 4, 2000). Understandably, however, that decision provides little guidance because the plaintiff in *Murphy* did not resist that portion of the defendant's motion to dismiss. *Id.* Here, the school district argues that the plaintiff's punitive damage claim should be dismissed because the school district is a municipality and is immune from punitive damages. Schultzen argues that punitive damages are allowed pursuant to the Supreme Court's decision in *Franklin*, which opined that "all appropriate relief" should be available under Title IX. *Franklin*, 503 U.S. at 69, 112 S.Ct. 1028.

Eighth Circuit caselaw regarding a related statute, the Rehabilitation Act of 1973, § 504, as amended, 29 U.S.C. § 794 ("Section 504"), provides clear support for the proposition that the Eighth Circuit would allow punitive damages in a Title IX action. *Cf. Gorman v. Easley*, 257 F.3d 738 (8th Cir.2001) (holding full spectrum of available remedies includes punitive damages); *Todd v. Elkins Sch. Dist. No. 10*, 105 F.3d 663, 1997 WL 7551 (8th Cir.1997) (per curiam) (table op.) (reversing district court's dismissal, which district court based on school district's claim of immunity); *Rodgers v. Magnet Cove Pub. Schs.*, 34 F.3d 642 (8th Cir.1994) (holding *Franklin* presumption of all available remedies applied to action brought under Section 504).

In *Rodgers v. Magnet Cove Public Schools*, the Eighth Circuit Court of Appeals considered whether Section 504 of the Rehabilitation Act provided a cause of action for legal damages. *Rodgers*, 34 F.3d at 643. On summary judgment, the district court dismissed the plaintiff's

claim, concluding that traditional legal damages were unavailable under Section 504. *Id.* The Eighth Circuit, however, reversed, and held that the Supreme Court's decision in *Franklin* was controlling on the issue. *Id.* at 644. The court reasoned that because Title IX and Section 504 were both modeled after Title VI and because Section 504's enforcement regime, as well as legislative history, closely track that of Title IX, the court of appeals concluded that the *Franklin* Court's holding translated into the context of Section 504. *Id.* at 643–44. Therefore, the Eighth Circuit held that the availability of all appropriate remedies is presumed under Section 504. *Id.* at 644. Because the statute does not evince a congressional intent to limit or restrict the remedies available, the court concluded that "the full spectrum of remedies" is available under Section 504. *Id.* at 645. The court did not, however, rule upon whether punitive damages were available against the public school district defendant because the plaintiff had not sought to recover them. *See id.* at 643.

In *Todd v. Elkins School District*, an unreported decision, the Eighth Circuit reversed in part and affirmed in part the district court's denial of the defendant school district's motion to dismiss on the basis of qualified immunity. *Todd*, 105 F.3d at 663, 1997 WL 7551, at *1. In pertinent part, the court affirmed the denial of the motion to dismiss with respect to the plaintiff's claim under Section 504. *Id.*, 1997 WL 7551, at *2. The court did not, however, discuss whether the plaintiff's claim for punitive damages against the school district was cognizable under Section 504.

Most recently, in *Gorman v. Easley*, the Eighth Circuit tackled head-on the issue of whether or not Section 504 permits the recovery of punitive damages. *See Gorman*, 257 F.3d at 745–49. Relying on

*Franklin* and the relationship between Title IX, Title VI, and Section 504, the court held that "logic dictates[ ] [that] the full panoply of remedies available under Title VI, including punitive damages, must be available under section[ ] 504." *Id.* at 747. The court's thoughtful analysis in *Gorman* began by recognizing that Section 504 borrows its remedies from Title VI. *Id.* at 745. Thus, the court reasoned that "[t]he pertinent question . . . is what remedies Title VI permits." *Id.*

Furthermore, Title IX was also modeled on Title VI, and in *Cannon*, the Supreme Court held that Title IX created an implied cause of action, despite the fact Title VI does not expressly so provide. *Gorman*, 257 F.3d at 745 (citing *Cannon*, 441 U.S. at 694–703, 99 S.Ct. 1946). In *Cannon*, the Supreme Court presumed that Congress knew that some lower courts had interpreted Title VI to include an implied cause of action; therefore, when Congress enacted Title IX modeled on Title VI, Congress must have intended Title IX to similarly include an implied cause of action. *Cannon*, 441 U.S. at 696–97, 99 S.Ct. 1946.

In *Franklin*, the Supreme Court arguably extended its holding in *Cannon* and clarified that money damages were an available remedy under Title IX. *Franklin*, 503 U.S. at 70–71, 112 S.Ct. 1028. Again "indulging in the assumption that Congress legislates in light of prevailing precedent," *Gorman*, 257 F.3d at 746 (explaining *Franklin* ), the Court relied on Section 504 caselaw and the 1986 and 1987 amendments to Title IX to find that Congress did not intend to limit the availability of remedies under Title IX. *Franklin*, 503 U.S. at 72–73, 112 S.Ct. 1028.

The Eighth Circuit held in *Rodgers* that the full spectrum of remedies is available under Section 504, just as it is under Title IX. *Rodgers*, 34 F.3d at 644. Thus, the quandary with which the Eighth Circuit was confronted in *Gorman* was whether this "full spectrum" included punitive damages. Because "[t]he Supreme Court has long made clear that punitive damages are an integral part of the common law tradition and the judicial arsenal," the Eighth Circuit held that "[p]unitive damages . . . fall within the panoply of remedies usually available to American courts." *Gorman*, 257 F.3d at 746. Therefore, the court unequivocally held that punitive damages are an available remedy for a prevailing Section 504 plaintiff, if appropriate. *Id.*

In addition, the *Gorman* court rejected a Sixth Circuit Court of Appeals decision that reached the contrary conclusion. *Id.* at 747–49. In *Moreno v. Consolidated Rail Corp.*, 99 F.3d 782 (6th Cir.1996), the Sixth Circuit held that punitive damages were not available under Section 504. The Eighth Circuit noted that it was "sympathetic to the Sixth Circuit's concerns," but rejected the Sixth Circuit's methodology in reaching its conclusion. *Gorman*, 257 F.3d at 747. The underlying concerns propelling the Sixth Circuit's decision were (1) since the enactment of Section 504, lower courts had been in near unanimity that Section 504 did not support punitive awards, and (2) given this fact, the Civil Rights Act of 1991, which provides for punitive damages for certain classes of violations, proved that Congress did not intend the availability of punitive damages for Section 504 claims. *Id.* (citing *Moreno*, 99 F.3d at 789–91).

The Eighth Circuit opined that the Sixth Circuit's reasoning was flawed for two primary reasons. *See id.* at 747–48. First, according to the Eighth Circuit, *Franklin* dictates that, in determining congressional intent, courts must look at the remedies available *at the time of enactment. Id.* at 747. With respect to Section 504, this requirement meant beginning with the enactment of Title VI in 1964, because Section 504 draws its remedies from Title VI.

*Id.* The Sixth Circuit, however, looked at subsequent amendments to Section 504 in 1986, 1987, and 1991. *Id.* This approach, opined the Eighth Circuit, undermined basic principles of statutory construction:

> To draw a contrary conclusion from those amendments would be to hold that Congress' understanding of section 504 in 1986 and 1987, and its understanding of section 504 and 202 [of the Americans with Disabilities Act] in 1991 trumped Congress' intent regarding those statutes when they were originally enacted, and in this way retroactively amended them.

*Id.* at 747–48 (citing *Brown & Williamson Tobacco Corp. v. FDA,* 153 F.3d 155, 167 (4th Cir.1998), which noted that a statute's intent at the time of its enactment governs over subsequent congressional understandings, and, in turn, citing *MCI Telecomm. Corp. v. AT & T,* 512 U.S. 218, 222, 114 S.Ct. 2223, 129 L.Ed.2d 182 (1994), *aff'd,* 529 U.S. 120, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000)).

Second, while the court noted that, at the time Congress enacted Section 504 and at the time of the subsequent amendments, most courts agreed that neither Section 504 nor Title VI afforded monetary relief to prevailing plaintiffs, "the governing statutes and precedents in this case operate as a one-way rachet: once a cause of action is discovered, it automatically entitles a plaintiff to all appropriate remedies; and that finding then extends those remedies to all other interrelated statutes." *Id.* at 748. Therefore, the Sixth Circuit's concern over precedent that predated *Franklin* was misplaced. *See id.*

In short, the Eighth Circuit held, although somewhat begrudgingly, that the proper construction of Section 504 necessitated a finding that the statute supported an award of punitive damages:

> *Cannon, Rodgers,* and *Meiner* postulate the creation of a private cause of action

in Title VI in 1964. Under *Franklin* we are to assume that action to have provided all remedies. Absent any subsequent contrary instruction, we are to assume those remedies to remain available under section[ ] 504 ... today. We therefore rule, albeit not with great satisfaction, that [this] section[ ] permit[s] an award of punitive damages.

*Id.* at 749.

The majority of courts to have addressed punitive damages under Section 504 post-*Franklin* have reached the same conclusion as the *Gorman* court—like Title IX, Section 504 provides for the full spectrum of available remedies, which includes punitive damages, to a prevailing plaintiff. *See Patricia N. v. Lemahieu,* 141 F.Supp.2d 1243, 1253 (D.Haw.2001) (refusing to create blanket prohibition on punitive damage awards under § 504); *Worthington v. City of New Haven,* 1999 WL 958627, at *16 (D.Conn. Oct. 5, 1999) ("[P]revailing plaintiffs may obtain punitive damages against a private party for a violation of the ADA or Section 504...."); *Proctor v. Prince George's Hosp. Ctr.,* 32 F.Supp.2d 820, 829–30 (D.Md.1998) (holding punitive damages are recoverable under § 504); *Hernandez v. City of Hartford,* 959 F.Supp. 125, 133–34 (D.Conn. 1997) ("Since *Franklin,* this court held that 'because of the relationship among Title IX, Title VI and § 504, the Supreme Court's determination that money damages are available under Title IX is dispositive of whether money damages are available under § 504.' Accordingly, 'the analysis developed in *Franklin* governs the inquiry under the Rehabilitation Act as well and inescapably leads to the conclusion that both compensatory and punitive damages are available.'") (quoting *DeLeo v. City of Stamford,* 919 F.Supp. 70, 73 (D.Conn.1995)); *Burns–Vidlak v. Chandler,* 980 F.Supp. 1144, 1148 (D.Haw. 1997) (" '[A]ppropriate relief' by its very

terms cannot be subject to blanket rules such as no punitive damages because what is appropriate very much depends on the facts of the case."); *Kilroy v. Husson College*, 959 F.Supp. 22, 24 (D.Me.1997) ("The Court is persuaded that a private cause of action to enforce the provisions of § 504 exists by implication and that punitive damages are recoverable under § 504."); *Garrett v. Chicago School Reform Bd. of Trustees*, 1996 WL 411319, at *4 (N.D.Ill. July 19, 1996) (refusing to strike plaintiff's claim for compensatory and punitive damages under § 504); *Zaffino v. Surles*, 1995 WL 146207, at *3 (S.D.N.Y. Mar. 31, 1995) (denying motion to dismiss and motion for summary judgment and rejecting defendant's argument that § 504 does not provide for punitive damages); *Kedra v. Nazareth Hosp.*, 868 F.Supp. 733, 740 (E.D.Pa. 1994) ("[P]unitive damages are appropriate for § 504 violations...."); *cf. W.B. v. Matula*, 67 F.3d 484, 494 (3d Cir.1995) ("'The traditional presumption in favor of all appropriate relief'" had not been rebutted; therefore, "plaintiffs may seek monetary damages directly under § 504") (quoting *Franklin*, 503 U.S. at 66, 112 S.Ct. 1028); *Pandazides v. Virginia Bd. of Educ.*, 13 F.3d 823, 832 (4th Cir.1994) (holding right to trial by jury is part of the full panoply of legal remedies available under Section 504); *Fitzgerald v. Green Valley Area Educ.*, 589 F.Supp. 1130, 1138 (S.D.Iowa 1984) (interpreting "full panoply" to encompass punitive damages and holding that, while available, their assessment was not justified under the facts of the case). Furthermore, most courts that have held, post-*Franklin*, that punitive damages are not available under Section 504 cite to cases that antedated the *Franklin* decision. *Dertz v. City of Chicago*, 1997 WL 85169, at *20 (N.D.Ill. Feb. 24, 1997) ("Section 504 of the Rehabilitation Act does not provide for punitive damages.") (citing *Cortes v. Board of Governors*, 766 F.Supp. 623, 626 (N.D.Ill.

1991)); *Williams v. Express Airlines I, Inc.*, 1993 WL 246228, at *1 (W.D.Tenn. Apr. 9, 1993) (same) (citing *Gelman v. Department of Educ.*, 544 F.Supp. 651, 654 (D.Colo.1982)). *But see Moreno*, 99 F.3d at 782 (finding that despite *Franklin* holding, punitive damages are not available under Section 504).

The punitive damages doctrine has been accepted as "settled law by nearly all state and federal courts, including [the Supreme Court]," for more than a century. *Smith v. Wade*, 461 U.S. 30, 35, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983) (citations omitted); *accord Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 15–18, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991) (reviewing history of punitive damages from Blackstone through the English and American courts); *International Brotherhood of Elec. Workers v. Foust*, 442 U.S. 42, 53, 99 S.Ct. 2121, 60 L.Ed.2d 698 (1979) (Blackmun, J., concurring) (noting the general rule that courts can award the "full panoply" of remedies and stating that "[p]unitive damages, being one of these tools, thus are presumptively available for use in appropriate cases"); *Day v. Woodworth*, 54 U.S. (13 How.) 363, 370, 14 L.Ed. 181 (1851) (observing common law principle that juries may award "exemplary, punitive or vindictive" damages). Given this backdrop, the import of the Eighth Circuit's decisions in *Gorman* and *Rodgers* is clear: Because the Eighth Circuit interpreted *Franklin*, which was itself a Title IX case, and its presumption of "all appropriate remedies" to include punitive damages, the logical extension of Eighth Circuit precedent inescapably leads to the conclusion that the Eighth Circuit would likewise hold that Title IX supports the recovery of punitive damages, which is in accord with the dominant post-*Franklin* trend among lower courts. "[T]here is no adequate basis, in the *Franklin* opinion or elsewhere, for exempting punitive damages from the full spectrum of remedies

generally available for violation of a federal statute such as Title IX...." *DeLeo,* 919 F.Supp. at 74.

### 3. Can a prevailing plaintiff recover punitive damages against a school district under Title IX?

Concluding that Title IX supports an award of punitive damages, however, does not reach the heart of this motion to dismiss because determining whether punitive damages are available against a municipal entity is an entirely discrete inquiry. The sticking point of this determination is reconciling the *Newport* Court's holding that "[g]iven that municipal immunity from punitive damages was well established at common law by 1871, ... 'Congress would have specifically so provided had it wished to abolish the doctrine[ ]'" *Newport,* 453 U.S. at 263, 101 S.Ct. 2748 (quoting *Pierson v. Ray,* 386 U.S. 547, 555, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967)), with the *Franklin* Court's holding that "'where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done.'" *Franklin,* 503 U.S. at 65, 112 S.Ct. 1028 (quoting *Bell v. Hood,* 327 U.S. 678, 684, 66 S.Ct. 773, 90 L.Ed. 939 (1946)).

#### a. The common-law tradition of municipal immunity: City of Newport v. Fact Concerts, Inc.

In *Newport,* Fact Concerts sued the City of Newport, and several Newport officials, when the city reneged on a license agreement between the parties. *Newport,* 453 U.S. at 250, 101 S.Ct. 2748. Specifically, Fact Concerts was a corporation whose business was to promote musical concerts. *Id.* It received permission from the Rhode Island Department of Natural Resources to present a summer jazz series in a state park located in the city of Newport. Fact Concerts obtained the proper licenses from Newport to hold two jazz concerts in August of 1975. *Id.*

Pursuant to the contract, Newport had the option of cancelling the contract if it deemed cancellation would protect the public. *Id.* Fact Concerts, however, retained complete control over the choice of performers and the type of music to be played. *Id.* When a booked performer cancelled his performance, Fact Concerts was forced to find a replacement and was able to hire the band, Blood, Sweat and Tears. *Id.* Despite the fact Blood, Sweat and Tears was a renowned jazz group that had performed at Carnegie Hall, the city council, "fear[ful] of attracting 'long-haired hangers-on,'" determined the band was a rock group and cancelled Fact Concerts's license for both days of the music series. *Id.* (quoting contemporary press accounts that attributed irrational fear to the council members).

Fact Concerts sued the city, the Newport mayor, and six other city council members, alleging, *inter alia,* that the license cancellation amounted to content-based censorship and was a violation of Fact Concerts's constitutional rights to free expression and due process. *Id.* at 252, 101 S.Ct. 2748. Fact Concerts sought both compensatory and punitive damages against the city and its officials under 42 U.S.C. § 1983. *Id.* The jury returned a verdict in favor of Fact Concerts and indeed awarded compensatory and punitive damages. *Id.* at 253, 101 S.Ct. 2748. The city appealed, arguing that punitive damages cannot be awarded against a municipality under section 1983, and the Supreme Court agreed. *Id.*

#### b. Newport's analytical framework: Two-part inquiry

The import of the *Newport* decision on Schultzen's claim for punitive damages

under Title IX has significantly less to do with the facts than it does with the *Newport* Court's reasoning. In *Newport*, the Court set out a two part test to determine whether punitive damages were available against a municipality. First, the Court held that Congress must evince an intent to eviscerate the well-established immunity of a municipal corporation from punitive damages before courts are empowered to award punitive damages against a municipality. *See id.* at 264–65, 101 S.Ct. 2748. Relying on the common-law tradition of municipal immunity, which was well entrenched at the time section 1983's predecessor was enacted in 1871, the Court reasoned that Congress must have been aware of this tradition; therefore, had it intended to abolish the doctrine, Congress would have so provided. *Id.* at 263, 101 S.Ct. 2748 (citing *Pierson*, 386 U.S. at 555, 87 S.Ct. 1213). To illustrate the pervasiveness of this common-law tradition, the Court cited several cases, dating back to 1846. *See id.* at 260–61, 101 S.Ct. 2748 (citing *Woodman v. Nottingham*, 49 N.H. 387 (1870); *City of Chicago v. Langlass*, 52 Ill. 256 (1869); *City Council of Montgomery v. Gilmer & Taylor*, 33 Ala. 116 (1858); *Order of Hermits of St. Augustine v. County of Philadelphia*, 4 Clark 120, 7 Pa. L.J. 124 (1847); *McGary v. President & Council of the City of Lafayette*, 12 Rob. 668 (La.1846)).

Enacted in light of this tradition, the Court then looked to the legislative history of section 1983 and its predecessor to ascertain Congress's views on municipal liability. *See id.* at 263–66, 101 S.Ct. 2748. Noting the extreme opposition to "punishing innocent taxpayers and bankrupting local governments" in the context of amendments to the Sherman Act, the Court educed that the concerns over the extension of public liability and its effect on the public fisc "reflect policy considerations similar to those relied upon by the common-law courts in rejecting punitive

damages awards." *Id.* at 265–66, 101 S.Ct. 2748. Accordingly, the Court opined that the opposition to municipal liability for punitive damages voiced during the debates surrounding amendments to the Sherman Act was no "less applicable with regard to the novel specter of punitive damages against municipalities" under section 1983. *Id.* at 266, 101 S.Ct. 2748. Given the common-law backdrop, the pregnant silence of the text of the statute itself, and the legislative history of the act, the Court held that Congress did not intend to disturb the settled common-law immunity. *Id.*

However, the second step of the *Newport* Court's analysis transgressed the text of the statute and its legislative history and examined "whether considerations of public policy dictate a contrary result." *See id.* With respect to punitive damages, the Court outlined their function:

Punitive damages by definition are not intended to compensate the injured party, but rather to punish the tortfeasor whose wrongful action was intentional or malicious, and to deter him and others from similar extreme conduct. *See* RESTATEMENT (SECOND) OF TORTS § 908 (1979); W. PROSSER, LAW OF TORTS 9–10 (4th ed.1971). Regarding retribution, it remains true that an award of punitive damages against a municipality "punishes" only the taxpayers, who took no part in the commission of the tort. These damages are assessed over and above the amount necessary to compensate the injured party. Thus, there is no question here of equitably distributing the losses resulting from official misconduct. *Cf. Owen v. City of Independence*, 445 U.S. at 657, 100 S.Ct. at 1418. Indeed, punitive damages imposed on a municipality are in effect a windfall to a fully compensated plaintiff, and are likely accompanied by an increase in taxes or a reduction of public services for the citi-

zens footing the bill. Neither reason nor justice suggests that such retribution should be visited upon the shoulders of blameless or unknowing taxpayers.

Under ordinary principles of retribution, it is the wrongdoer himself who is made to suffer for his unlawful conduct. If a government official acts knowingly and maliciously to deprive others of their civil rights, he may become the appropriate object of the community's vindictive sentiments. *See generally Silver v. Cormier,* 529 F.2d 161, 163 (C.A.10 1976); *Bucher v. Krause,* 200 F.2d 576, 586–588 (C.A.7 1952), *cert. denied,* 345 U.S. 997, 73 S.Ct. 1141, 97 L.Ed. 1404 (1953). A municipality, however, can have no malice independent of the malice of its officials. Damages awarded for punitive purposes, therefore, are not sensibly assessed against the governmental entity itself.

*Id.* at 266–67, 101 S.Ct. 2748.

Furthermore, the Court identified the purpose of section 1983 specifically, observing that "the deterrence of future abuses of power by persons acting under color of state law is an important purpose of § 1983." *Id.* at 268, 101 S.Ct. 2748 (citing *Owen v. City of Independence,* 445 U.S. 622, 651, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980); *Robertson v. Wegmann,* 436 U.S. 584, 591, 98 S.Ct. 1991, 56 L.Ed.2d 554(1978)). However, for several reasons, the Court ultimately determined that this end was not better served by the imposition of punitive damages against a municipality. *See id.* at 267–71, 101 S.Ct. 2748. First, the Court opined that it was "far from clear" that officials would be deterred from wrongdoing by the threat of punitive awards against the city that employs them. *Id.* at 268–69, 101 S.Ct. 2748. Second, the Court noted that discharge of the offending official or other corrective action would occur regardless of the imposition of punitive damages. *Id.* at 269, 101 S.Ct. 2748. " 'The more reasonable assumption is that

responsible superiors are motivated not only by concern for the public fisc but also by concern for the Government's integrity.' " *Id.* (quoting *Carlson v. Green,* 446 U.S. 14, 21, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980)).

Moreover, the Court reiterated the substantial costs of punitive damages awards when they are assessed against a municipality. *See id.* at 270, 101 S.Ct. 2748. Because the Court only one year prior to the *Newport* decision in *Maine v. Thiboutot,* 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980), had interpreted section 1983 to encompass liability for violations of federal statutory as well as constitutional law, "the possibility of having to assure compensation for persons harmed by abuses of governmental authority covering a large range of activity in everyday life" created "a serious risk to the financial integrity of these governmental entities." *Newport,* 453 U.S. at 270, 101 S.Ct. 2748. The Court deemed this expanded liability, coupled with the fact that evidence of a tortfeasor's wealth is traditionally admissible as a measure of the amount of punitive damages to assess, too risky of an approach to allow. *See id.* at 270–71, 101 S.Ct. 2748.

However, the Court arguably placed greatest emphasis on the fact that a more effective means of deterrence was available under section 1983. *See id.* at 269–70, 101 S.Ct. 2748. Namely, the Court determined that section 1983's deterrent effect was sufficiently advanced by the threat of punitive damages against the individual wrongdoer:

By allowing juries and courts to assess punitive damages in appropriate circumstances against the offending official, based on his personal financial resources, the statute directly advances the public's interest in preventing repeated constitutional deprivations. In our view, this provides sufficient protec-

tion against the prospect that a public official may commit recurrent constitutional violations by reason of his office.... [A] damages remedy recoverable against individuals is more effective as a deterrent than the threat of damages against a government employer.

*Id.* (citing *Carlson*, 446 U.S. at 21, 100 S.Ct. 1468) (footnote omitted).

Thus, in the Court's view, public policy was not furthered by imposing the threat of punitive damages against a municipality. *Id.* at 271. Rather, public policy would be hindered by the possibility of large damages awards because the taxpayer would ultimately have to foot the bill. *Id.* Guided by both the purposes of section 1983 and general principles of public policy, the Court concluded that "a municipality is immune from punitive damages under 42 U.S.C. § 1983." *Id.*

### c. The common-law tradition of the availability of all remedies: Franklin v. Gwinnett County

Eleven years after *Newport*, the Supreme Court in *Franklin* addressed "whether the implied right of action under Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681–1988 (Title IX) ... supports a claim for monetary damages." *Franklin*, 503 U.S. at 62–63, 112 S.Ct. 1028. In *Franklin*, the petitioner, Christine Franklin, was subjected to continual sexual harassment by a high school teacher for approximately two years. *Id.* at 63, 112 S.Ct. 1028. After investigating complaints of sexual harassment by Franklin and other female students, the school district terminated the teacher but took no further action against him and closed the investigation. *Id.* Franklin, unsatisfied with this purported "resolution" of her complaint, filed an action under Title IX in federal district court seeking monetary damages. *Id.* at 64, 112 S.Ct. 1028. The district court, however, dismissed Franklin's complaint on the ground Title IX did

not authorize an award of damages, and the Eleventh Circuit Court of Appeals affirmed. *Id.*

Reversing, the Supreme Court traced a long-standing rule whose anchor was first cast in *Marbury v. Madison:* where there is a right there is a remedy. *Id.* at 66, 112 S.Ct. 1028 (citing *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 163, 2 L.Ed. 60 (1803)). Specifically, Chief Justice Marshall animadverted that remedies to right a wrong are critical to the survival of the republican form of government:

> [O]ur Government "has been emphatically termed a government of laws, and not of men. It will certainly cease to deserve this high appellation, if the laws furnish no remedy for the violation of a vested legal right." This principle originated in the English common law, and Blackstone described it as "a general and indisputable rule, that where there is a legal right, there is also a legal remedy, by suit or action at law, whenever that right is invaded." 3 W. Blackstone, Commentaries 23 (1783). *See also Ashby v. White*, 1 Salk. 19, 21, 87 Eng. Rep. 808, 816 (Q.B.1702) ("If a statute gives a right, the common law will give a remedy to maintain that right ...").

*Id.* at 66–67, 112 S.Ct. 1028 (quoting *Marbury*, 5 U.S. (1 Cranch), at 163).

The Court also observed that it has repeatedly held that "'where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done.'" *Id.* at 66, 112 S.Ct. 1028 (quoting *Bell v. Hood.*, 327 U.S. 678, 684, 66 S.Ct. 773, 90 L.Ed. 939 (1946)). In *Franklin*, the Title IX plaintiff's wrong could not be righted in the absence of monetary damages. *Id.* at 75–75, 112 S.Ct. 1028. The traditional presumption of the availability

of all appropriate relief was presumptively known to Congress at the time it enacted Title IX, and, if Congress intended to limit the applicability of the presumption, such intent must be evaluated at the time of Title IX's passage. *Id.* at 71, 112 S.Ct. 1028 (citing *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 378, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982)). "In the years before and after Congress enacted this statute, the Court 'follow[ed] a common-law tradition [and] regarded the denial of a remedy as the exception rather than the rule.'" *Id.* (citing *Curran*, 456 U.S. at 375, 102 S.Ct. 1825) (alteration provided by *Franklin* Court).

The Court specifically examined amendments to Title IX, passed in 1986 and in 1987. *See id.* at 72–73, 112 S.Ct. 1028. Because these amendments did not alter, and, by implication ratified, the *Cannon* Court's recognition of an implied cause of action under Title IX, the Court determined that Congress legislated with full cognizance of the traditional presumption of the availability of all remedies in the face of a recognized legal right and did not seek to alter this presumption. *See id.* The Court reasoned as follows:

> In the years *after* the announcement of *Cannon* ... a more traditional method of statutory analysis is possible, because Congress was legislating with full cognizance of that decision. Our reading of the two amendments to Title IX enacted after *Cannon* leads us to conclude that Congress did not intend to limit the remedies available in a suit brought under Title IX. In the Rehabilitation Act Amendments of 1986, 100 Stat. 1845, 42 U.S.C. § 2000d–7, Congress abrogated the States' Eleventh Amendment immunity under Title IX, Title VI, § 504 of the Rehabilitation Act of 1973, and the Age Discrimination Act of 1975. This statute cannot be read except as a validation of *Cannon*'s holding. A subsection of the 1986 law provides that in a suit against a State, "remedies (including remedies both at law and in equity) are available for such a violation to the same extent as such remedies are available for such a violation in the suit against any public or private entity other than a State." 42 U.S.C. § 2000d–7(a)(2). While it is true that this saving clause says nothing about the nature of those other available remedies, *cf. Milwaukee v. Illinois*, 451 U.S. 304, 329, n. 22, 101 S.Ct. 1784, 1798–1799, n. 22, 68 L.Ed.2d 114 (1981), absent any contrary indication in the text or history of the statute, we presume Congress enacted this statute with the prevailing traditional rule in mind.

> In addition to the Rehabilitation Act Amendments of 1986, Congress also enacted the Civil Rights Restoration Act of 1987, Pub.L. 100–259, 102 Stat. 28. Without in any way altering the existing rights of action and the corresponding remedies permissible under Title IX, Title VI, § 504 of the Rehabilitation Act, and the Age Discrimination Act, Congress broadened the coverage of these antidiscrimination provisions in this legislation. In seeking to correct what it considered to be an unacceptable decision on our part in *Grove City College v. Bell*, 465 U.S. 555, 104 S.Ct. 1211, 79 L.Ed.2d 516 (1984), Congress made no effort to restrict the right of action recognized in *Cannon* and ratified in the 1986 Act or to alter the traditional presumption in favor of any appropriate relief for violation of a federal right. We cannot say, therefore, that Congress has limited the remedies available to a complainant in a suit brought under Title IX.

*Id.* at 72, 112 S.Ct. 1028.

### d. *Reconciling* Franklin *with* Newport

Thus, critical to both the *Newport* and the *Franklin* analyses was the assumption

that Congress legislates in light of common-law tradition. In *Newport*, the tradition in question was municipality immunity from punitive damages. *See Newport*, 453 U.S. at 263–64, 101 S.Ct. 2748. In *Franklin*, the tradition in question was the presumptive validity of all available remedies. *See Franklin*, 503 U.S. at 66, 112 S.Ct. 1028. Since *Franklin*, courts have struggled with reconciling these two traditions. Citing to *Newport* and its general proposition that punitive damages are not recoverable against a municipality absent express statutory authority, some district courts have found that punitive damages are not allowed in a Title IX action. *See Landon v. Oswego Unit Sch. Dist. No. 308*, 143 F.Supp.2d 1011, 1014 (N.D.Ill.2001); *Flores v. Saulpaugh*, 115 F.Supp.2d 319, 320 n. 1 (N.D.N.Y.2000); *Booker v. Boston*, 2000 WL 1868180 (D.Mass. Dec.12, 2000); *Morlock v. West Cen. Educ. Dist.*, 46 F.Supp.2d 892, 924 (D.Minn.1999); *Crawford v. School Dist. of Philadelphia*, 1998 WL 288288 (E.D.Pa. June 3, 1998); *Doe v. Londonderry Sch. Dist.*, 970 F.Supp. 64, 76 (D.N.H.1997). Relying on *Franklin*, other district courts have held that the presumption of the availability of all remedies in a Title IX action includes the recovery of punitive damages. *See Mercer v. Duke University*, 2001 WL 1729629, at *15 (M.D.N.C. Mar. 12, 2001); *Henkle v. Gregory*, 150 F.Supp.2d 1067, 1077–78 (D.Nev. 2001); *Canty v. Old Rochester Reg. Sch. Dist.*, 54 F.Supp.2d 66, 70 (D.Mass.1999); *Doe v. Oyster River Coop. Sch. District*, 992 F.Supp. 467, 483 (D.N.H.1997).

This court, however, sees no inconsistency between the two opinions. Generally, punitive damages are not recoverable against municipalities or municipal subdivisions absent express statutory authority, unless considerations of public policy would dictate a contrary result. *See Newport*, 453 U.S. at 260 n. 21, 101 S.Ct. 2748 (holding punitive damages are unavailable against a municipality under § 1983). On its face, Title IX provides no statutory authority for the recovery of a punitive damages award against a municipality. *See* 20 U.S.C. § 1681 *et seq.* The *Newport* tradition of municipal immunity dates back at least to 1871, *Newport*, 453 U.S. at 258, 101 S.Ct. 2748; thus, Title IX was enacted within the context of that tradition. *See Franklin*, 503 U.S. at 70, 112 S.Ct. 1028. At the same time, *Franklin* expressly held that Title IX supports an award of all available remedies, which the Eighth Circuit has determined includes punitive damages. *Compare id.* (authorizing any available remedies under Title IX), *with Gorman*, 257 F.3d at 746 (interpreting *Franklin*'s full spectrum of remedies to include punitive damages). Neither the text of Title IX nor its legislative history reveals any indicia of congressional intent to abandon either tradition. While Eighth Circuit caselaw has interpreted "all available remedies" to include punitive damages, *Gorman*, 257 F.3d at 746, punitive damages against a municipality were not "available," in terms of the common-law tradition, at the time either Title IX or its archetype, Title VI, was passed, in 1972 and in 1964, respectively. *Cf. Newport*, 453 U.S. at 263, 101 S.Ct. 2748 (stating common-law tradition immunizing municipalities from punitive damages was well-established by 1871). Nevertheless, this court would be remiss of its responsibilities if it ceased its inquiry at this point without exploring the second step of the *Newport* test, which examines whether public policy dictates a divergence from the common-law tradition of municipal immunity from punitive damages.

#### e. *District courts' treatment of Title IX, municipal entities, and punitive damages: An overview*

The district courts that have relied on *Newport* in rejecting the availability of punitive damages awards under Title IX

make much of the cost of such awards to innocent taxpayers and note that the rationale underlying *Newport* regarding the common-law rule immunizing municipalities from punitive damages is equally applicable to claims against municipal entities under Title IX. For instance, the United States District Court for the District of New Hampshire held that Title IX did not support an award of punitive damages against a municipality because "Title IX contains no statutory authority for awarding a punitive damage award against a municipality." *Doe v. Londonderry Sch. Dist.*, 970 F.Supp. 64, 76 (D.N.H.1997) (citing 20 U.S.C.A. § 1681 (West 1990)). Furthermore, the district court found support for its conclusion in the text of Title VII, which it determined was often utilized as a teaching tool in interpreting Title IX. *Id.* Under Title VII, " '[a] complaining party may recover punitive damages ... against a respondent (other than a government, governmental agency or political subdivision)....' " *Id.* (quoting 42 U.S.C.A. § 1981a(b)(1) (West 1994)).

This court will not adopt the *Londonderry* court's reasoning because, in this court's opinion, the *Londonderry* court's failure to reach the second step of the *Newport* inquiry is in error. While the *Newport* Court indeed held that punitive damages are not generally recoverable against municipalities absent statutory au-

thority, the Court indicated that public policy may compel a different result. *See Newport*, 453 U.S. at 266, 101 S.Ct. 2748. The New Hampshire district court, however, neglected to address any considerations of public policy.[5]

Moreover, the *Londonderry* court's analogy to Title VII's punitive damages provision is inapposite. *Franklin* and *Newport* both command that statutes are to be interpreted at the time of their enactment. *See Franklin*, 503 U.S. at 71, 112 S.Ct. 1028; *Newport*, 453 U.S. at 259–60, 101 S.Ct. 2748. The Title VII provision regarding governmental immunity from punitive damages cited by the *Londonderry* court was passed in 1991 and does not on its face apply to Title IX. Thus, the Title VII analogy is inapt, and there is no logical basis upon which to retroactively apply a 1991 Title VII amendment to Title IX. *Cf. Gorman*, 257 F.3d at 747 (stating 1991 amendment did not affect status quo that punitive damages are available under sections 504 and the ADA).

"Title IX was patterned after Title VI of the Civil Rights Act of 1964," and the statutes contain virtually identical language.[6] *Cannon*, 441 U.S. at 694, 99 S.Ct. 1946.

Except for the substitution of the word "sex" in Title IX to replace the words

---

**5.** For this same reason, the court will decline adopting the analysis employed by the United States District Court for the District of Minnesota in *Morlock v. West Central Education District*, 46 F.Supp.2d 892, 923–924 (D.Minn. 1999). In *Morlock,* the court reasoned that "[t]he rationale underlying *Newport* is equally applicable to punitive damages awards against school districts under Title IX." *Id.* at 924. Accordingly, the district court dismissed the plaintiff's claim for punitive damages under Title IX against the municipal defendants. *Id.* However, like the *Londonderry* court, the *Morlock* court did not examine whether public policy dictated a contrary result.

**6.** *Compare* Title IX, 20 U.S.C. § 1681 ("No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance...."), *with* Section 601 of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d ("No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.")

"race, color, or national origin" in Title VI, the two statutes use identical language to describe the benefited class. Both statutes provide the same administrative mechanism for terminating federal financial support for institutions engaged in prohibited discrimination. Neither statute expressly mentions a private remedy for the person excluded from participation in a federally funded program. The drafters of Title IX explicitly assumed that it would be interpreted and applied as Title VI had been during the preceding eight years.

*Id.* at 694–96, 99 S.Ct. 1946 (footnotes omitted). Thus, because of this close relationship between the two acts, amendments to Title VI would be highly relevant to this court's interpretation of Title IX, but amendments to Title VII have little bearing on this court's interpretation of Title IX.[7] *Cf. Lipsett v. University of Puerto Rico*, 864 F.2d 881, 897 (1st Cir.1988) (limiting application of Title VII principles to only those Title IX cases involving employment discrimination). While it is true that the 1991 amendments are difficult to reconcile with the presumptive availability of punitive damages, "*Cannon* and *Franklin* compel the conclusion that punitive damages were available as a remedy to a private cause of action under Title VI in 1964, and it is that assumption which provides the baseline against which subsequent amendments must be gauged." *Gorman*, 257 F.3d at 747.

In *Gorman*, the Eighth Circuit held that the 1986, 1987, and 1991 amendments to the Rehabilitation Act and the Americans With Disabilities Act ("ADA") did not disturb the common-law tradition that the full panoply of remedies, including punitive damages, is available under those acts. *See id.* at 746–47. That is so because "[a]s in *Franklin*, we must ... conclude that Congress assumed the availability of all remedies, including punitive damages, under Title VI [the act on which Title IX, Section 504, and the ADA were modeled]. Congress has not since amended Title VI to limit any cause of action implied thereunder, nor the remedies that might accompany such a cause of action...." *Id.* at 747. Therefore, notwithstanding the 1991 amendments to Title VII, the Eighth Circuit concluded that "logic dictates, the full panoply of remedies available under Title VI, including punitive damages, must be available under sections 504 and 202." *Id.* For the same reasons that the Eighth Circuit determined that the 1991 amendments to the Civil Rights Act did not disturb the availability of punitive damages under section 504, which was also patterned on Title VI, this court concludes that the 1991 amendment which provides for municipal immunity from punitive damages does not affect this court's interpretation of municipal immunity under Title IX.

Approximately two months after the *Londonderry* decision in 1997, another United States district court in the District of New Hampshire addressed whether Title IX supports an award of punitive damages against a municipal entity in *Doe v. Oyster River Cooperative School District*, 992 F.Supp. 467 (D.N.H.1997). The *Oyster River* court concluded, as did the *Londonderry* court, that "Congress was sensitive to the financial difficulties of grant recipients and ... it demonstrated no intention of disturbing the common law rule that municipalities are entitled to immunity from punitive damages." *Id.* at 483.

---

**7.** Furthermore, the Supreme Court in *Gebser v. Lago Vista Independent School District*, 524 U.S. 274, 282, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998), explicitly rejected the invitation to utilize agency principles employed in assessing an employer's liability under Title VII in the context of Title IX. Hence, there are clearly circumstances in which courts' interpretations of Title VII do not provide guidance in interpreting Title IX.

After examining portions of the legislative history of Title VI, the court determined that the objectives of Title IX could be fulfilled without imposing the harsh sanction of punitive damages against a governmental entity. *See id.* at 482–83. The court reasoned that, instead of punitive damages, Congress provided a "punitive-like sanction of terminating federal funding." *Id.* at 483.

At the same time, the *Oyster River* court curiously dropped a footnote indicating that certain circumstances might warrant an award of punitive damages against a municipality:

> [I]n the rare case in which a local public school district has demonstrated complete indifference to the requirements of Title IX and has committed ongoing egregious violations with no sign of relenting, a federal court might determine, in its discretion, that a punitive damages remedy for a private party is the best, or only, means of forcing the school district into compliance. In such a case, the public policies underlying municipal immunity might give way in favor of the federal government's overriding interest in preventing its funds from being spent on discriminatory practices. The circumstances alleged in the present action against defendants are such that the court need not address the issue.

*Id.* at 483 n. 17.

This dicta undermines the *Oyster River* court's preceding reasoning. First, in order to recover punitive damages in any case, a plaintiff must establish a high threshold requirement of malicious conduct. *See, e.g., Miller v. Kenworth of Dothan, Inc.,* 277 F.3d 1269 (11th Cir.2002) (" '[F]or the issue of punitive damages to reach the jury in a section 1981 case, the plaintiff must come forward with substantial evidence that the employer acted with actual malice or reckless indifference to his federally protected rights.' ") (citing

*Kolstad v. American Dental Ass'n,* 527 U.S. 526, 536–37, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999)) (page references not yet available); *Gorman,* 257 F.3d at 749 ("The defendant's conduct must be shown to have been 'motivated by evil motive or intent, or ... reckless or callous indifference to the federally protected rights of others.' ") (quoting *Smith v. Wade,* 461 U.S. 30, 56, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983)) (alteration provided by Eighth Circuit) (citing *Kolstad,* 527 U.S. 526, 119 S.Ct. 2118, 144 L.Ed.2d 494, which discussed punitive damages scheme under 42 U.S.C. § 1981a); *Foster v. Time Warner Entertainment Co.,* 250 F.3d 1189 (8th Cir. 2001) ("Punitive damages are appropriate [in an ADA retaliation action] if an employer engaged in intentional discrimination with 'malice or reckless indifference to the [plaintiff's] federally protected rights.' ") (quoting *Kolstad,* 527 U.S. at 536–37, 119 S.Ct. 2118); *Hampton v. Dillard Dep't Stores, Inc.,* 247 F.3d 1091 (10th Cir.2001) (" 'In the Tenth Circuit, the standard for punitive damages for discrimination in violation of federal civil rights is that the discrimination must have been malicious, willful, and in gross disregard of [plaintiff's] rights.' ") (quoting *Jackson v. Pool Mortgage Co.,* 868 F.2d 1178, 1181 (10th Cir.1989)) (internal quotations omitted); *Beauford v. Sisters of Mercy–Province of Detroit, Inc.,* 816 F.2d 1104, 1109 (6th Cir.1987) ("The imposition of punitive damages in civil rights actions has generally been limited to cases involving egregious conduct or a showing of willfulness or malice on the part of the defendant.") (citing *Wolfel v. Bates,* 707 F.2d 932, 934 (6th Cir.1983)); *Guzman v. Western State Bank of Devils Lake,* 540 F.2d 948, 953 (8th Cir.1976) ("Punitive damages may also be awarded in civil rights actions [under § 1983] where the defendant exhibits oppression, malice, gross negligence, willful or wanton misconduct, or a reckless disregard for the civil rights of the plain-

tiff.") (citing *Paton v. La Prade*, 524 F.2d 862, 872 (3d Cir.1975); *Jeanty v. McKey & Poague, Inc.*, 496 F.2d 1119, 1121 (7th Cir.1974); *Gill v. Manuel*, 488 F.2d 799, 801 (9th Cir.1973); *Caperci v. Huntoon*, 397 F.2d 799, 801 (1st Cir.), *cert. denied*, 393 U.S. 940, 89 S.Ct. 299, 21 L.Ed.2d 276 (1968)); *Majocha v. Turner*, 166 F.Supp.2d 316, 325 (W.D.Pa.2001) ("Plaintiffs are entitled to compensatory damages and may be entitled to punitive damages under the Rehabilitation Act of 1973 if they demonstrate that defendants engaged in discriminatory practices with malice or with reckless indifference to the rights of an aggrieved individual.") (citing *J.F. ex rel. D.F. v. School Dist. of Philadelphia*, 2000 WL 361866, at *19 (E.D.Pa.2000); *Merchant v. Kring*, 50 F.Supp.2d 433, 436 (W.D.Pa.1999); *Saylor v. Ridge*, 989 F.Supp. 680, 690 (E.D.Pa.1998); *Doe v. Shapiro*, 852 F.Supp. 1246, 1255 (E.D.Pa. 1994)); *accord* RESTATEMENT (SECOND) OF TORTS § 908 cmt. b (1977) ("Since the purpose of punitive damages is not compensation of the plaintiff but punishment of the defendant and deterrence, these damages can be awarded only for conduct for which this remedy is appropriate—which is to say, conduct involving some element of outrage similar to that usually found in crime.... Punitive damages are not awarded for mere inadvertence, mistake, errors of judgment and the like, which constitute ordinary negligence."); *cf. Preferred Properties, Inc. v. Indian River Estates, Inc.*, 276 F.3d 790 (6th Cir.2002) ("The standard for punitive damages in a federal civil rights action [here, the Fair Housing Act] is based on the defendant's

state of mind and does not require egregious or outrageous behavior.") (citing *Smith v. Wade*, 461 U.S. 30, 56, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983), which held that a jury may award punitive damages in a § 1983 action "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others") (page references not yet available). Given this high threshold requirement, it seems that the "rare case" hypothesized by the New Hampshire district court illustrates the typical and, moreover, only case in which punitive damages would be appropriate.

Second, the common law immunity that the *Oyster River* court contends shields school districts from punitive damages under Title IX is an absolute one. *See Newport*, 453 U.S. at 271, 101 S.Ct. 2748 (reasoning that "[b]ecause *absolute immunity* from such damages obtained at common law and was undisturbed by the 42d Congress, and because that immunity is compatible with both the purposes of § 1983 and general principles of public policy, we hold that a municipality is immune from punitive damages under 42 U.S.C. § 1983") (emphasis added). Absolute immunity is just that—absolute. It functions as an impenetrable steel curtain, shrouding local governments from claims for punitive damages. Thus, if school districts truly were protected from punitive damages under Title IX by the cloak of common-law immunity that was explained in *Newport*, there could be no "rare cases" that would override the municipality's absolute immunity.[8] The *Oyster River*

---

**8.** The *Newport* Court dropped a footnote indicating that "[i]t is possible to imagine an extreme situation where the taxpayers are directly responsible for perpetrating an outrageous abuse of constitutional rights.... [However], such an occurrence is sufficiently unlikely that we need not anticipate it here." *Newport*, 453 U.S. at 267 n. 29, 101 S.Ct.

2748. It is possible that the *Oyster River* court interpreted this hypothesized situation as the "rare case" to which it referred. *See Oyster River*, 992 F.Supp. at 483 n. 17. However, had this been the *Oyster River* court's intent, the court most likely would have, at minimum, cited the *Newport* footnote. Because the court gave no indication that its

court's footnote, therefore, can only be read to convert the immunity discussed in *Newport* into one of qualified immunity, but with no authority to do so, given that Title IX was not enacted within the context of a common-law tradition of *qualified* immunity.

In addition, the court also examined the Rehabilitation Amendments Act of 1986, Pub.L. 99–506, 100 Stat. 1845, *codified at* 42 U.S.C. § 2000d–7. *Id.* at 483–84. In the 1986 act, Congress abrogated states' sovereign immunity from suit brought under Title IX, Title VI, Section 504 of the Rehabilitation Act of 1973, and the ADA. Pursuant to the act, states are liable to the same extent and for the same remedies as available against " 'any public or private entity other than a State.' " *Id.* at 484 (quoting 42 U.S.C. § 2000d–7(a)(2)). The court recognized that Congress's intent in abrogating sovereign immunity may have been to disturb the common-law immunity traditionally enjoyed by local governments. *Id.* Nevertheless, the court ultimately determined that it "need not decide this nettlesome question because the defendant is entitled to summary judgment on the alternative ground that the evidence does not support the inference that punitive damages are warranted in this case." *Id.* Thus, despite the fact the *Oyster River* court did not conceal its disinclination toward allowing punitive damages under Title IX against a municipal entity, its statements to that effect are purely dicta, because the court determined that even if punitive damages were available, the facts of the case did not warrant their imposition.

This court will also reject the reasoning employed by the United States District Court for the Northern District of Illinois in *Landon v. Oswego Unit School District,* 143 F.Supp.2d 1011 (N.D.Ill.2001), which held that, like section 1983, neither the text nor the legislative history of Title IX expressly abandons the common-law principle that punitive damages are not available against a municipality. *Id.* at 1014. Reconciling *Newport* with *Franklin,* the district court stated:

> [W]hile Congress did not intend to limit the remedies available in a Title IX suit (*Franklin,* 503 U.S. at 72, 112 S.Ct. 1028, 117 L.Ed.2d 208), and the remedies available are extensive (*Waid,* 91 F.3d at 861), punitive damages are not remedial and are not intended to compensate the injured party. Instead, punitive damages are vindictive damages that are awarded to punish the wrongdoer. *Newport,* 453 U.S. at 263, 265–67, 101 S.Ct. 2748, 69 L.Ed.2d 616. A plaintiff may be awarded all available compensatory damages for a violation of Title IX " 'to make good the wrong done,' " (*Franklin,* 503 U.S. at 66, 112 S.Ct. 1028, 117 L.Ed.2d 208), quoting *Bell v. Hood,* 327 U.S. 678, 684, 66 S.Ct. 773, 90 L.Ed. 939 (1946); but an award of punitive damages goes beyond such remedy and is, therefore, not recoverable against a municipality absent express statutory authority (*Newport,* 453 U.S. at 263–64, 101 S.Ct. 2748, 69 L.Ed.2d 616).

*Id.*

The *Landon* court also examined several facets of public policy and ultimately held that punitive damages were not available against a municipal entity. *See id.* Namely, the court reasoned that "[a]s in *Newport,* an award of punitive damages against a municipality would only punish the taxpayer who took no part in the wrongdoing.... Exposing municipalities

---

proposed "rare case" was one in which taxpayers were directly culpable for the school district's discriminatory practices, this court is of the opinion that the *Oyster River* court was not summarizing the *Newport* Court's footnote.

to such liability fails to advance the retributive purpose of a punitive damage award and imposes an unreasonable burden on the taxpayers who support them." *Id.*

The *Landon* court also noted that a more effective means of deterring future conduct would be an assessment of punitive damages against an offending official. *Id.* This reasoning appears to have come directly from the *Newport* decision itself. However, the Illinois court failed to recognize that Title IX does not support an award of punitive damages against an offending official, because only recipients of federal funds are subject to Title IX liability. *See* 20 U.S.C. § 1681 *et seq.; Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 640–41, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999) (noting that *recipients* of federal funds may be liable in damages under Title IX for its own misconduct, not that of its agents, and that damages liability under Title IX is not extended to parties outside the scope of the government's power to place limitations on fund recipients); *Gebser v. Lago Vista Independent School Dist.*, 524 U.S. 274, 287, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1999) (same); *Guardians Ass'n v. Civil Service Comm'n of City of New York*, 463 U.S. 582, 635, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983) (same) (Stevens, J., dissenting, on other grounds); *Klemencic v. Ohio State Univ.*, 263 F.3d 504, 510 (6th Cir.2001) (" '[O]nly recipients of federal funds may be liable for damages under Title IX.' ") (quoting *Soper v. Hoben*, 195 F.3d 845, 854 (6th Cir.1999), which in turn cites *Davis*, 526 U.S. at 640–41, 119 S.Ct. 1661); *Shrum ex rel. Kelly v. Kluck*, 249 F.3d 773, 781–82 (8th Cir.2001) (recognizing recipient of federal funding can only be held liable under Title IX for its own misconduct); *Hartley v. Parnell*, 193 F.3d 1263, 1270 (11th Cir.1999) ("Individual school officials ... may not be held liable under Title IX.") (citing *Floyd v. Waiters*, 133 F.3d 786, 789 (11th Cir.1998), which stated, "[A] Title IX claim can only

be brought against a grant recipient—that is, a local school district—and not an individual.") (citations and quotations omitted), *cert. granted, judgment vacated by,* 525 U.S. 802, 119 S.Ct. 33, 142 L.Ed.2d 25 (1998), *on remand to,* 171 F.3d 1264 (11th Cir.), *cert. denied,* 528 U.S. 891, 120 S.Ct. 215, 145 L.Ed.2d 181 (1999); *Kinman v. Omaha Public Sch. Dist.*, 171 F.3d 607, 611 (8th Cir.1999) (" 'The fact that title IX was enacted pursuant to Congress's spending power is evidence that it prohibits its discriminatory acts only by grant recipients.' ") *Rowinsky v. Bryan Indep. Sch. Dist.*, 80 F.3d 1006, 1012 (5th Cir.), *cert. denied,* 519 U.S. 861, 117 S.Ct. 165, 136 L.Ed.2d 108 (1996). Several circuits have held that because they are not grant recipients, school officials may not be sued in their individual capacity under Title IX. *See Floyd v. Waiters,* 133 F.3d 786, 789 (11th Cir.), *vacated and remanded,* 525 U.S. 802, 119 S.Ct. 33, 142 L.Ed.2d 25 (1998); *Smith,* 128 F.3d at 1019; *Lipsett v. University of Puerto Rico,* 864 F.2d 881, 901 (1st Cir.1988); *see also Lillard v. Shelby County Bd. of Educ.,* 76 F.3d 716, 730 (6th Cir.1996) (Nelson, J., concurring) (stating that only educational institutions may be found liable for Title IX violations). *See also National Collegiate Athletic Ass'n v. Smith,* 525 U.S. 459, 119 S.Ct. 924, 142 L.Ed.2d 929 (1999) (receipt of dues from member colleges and universities does not subject NCAA to suit under Title IX); *Ferguson v. City of Phoenix,* 157 F.3d 668, 678 (9th Cir.1998) (noting contractual relationship involved in legislation passed pursuant to the Spending Clause and explaining that this contractual relationship is what makes funding recipients subject to Title VI and Title IX liability); *Smith v. Metropolitan School Dist. Perry Tp.,* 128 F.3d 1014, 1028 (7th Cir. 1997) ("[O]nly a grant recipient—a recipient of grant funds to run a 'program or activity'—can violate Title IX."); *Clark v.*

*Bibb County Bd. of Educ.*, 174 F.Supp.2d 1369, 1373 (M.D.Ga.2001) ("[O]nly funding recipients are subject to suit under Title IX.") (citing *Davis*, 526 U.S. at 640–41, 119 S.Ct. 1661; *Hartley*, 193 F.3d at 1270); *C.R.K. v. U.S.D.*, 260, 176 F.Supp.2d 1145, 1167 (D.Kan.2001) (granting summary judgment against individual defendants on ground they are not subject to Title IX liability); *Hayut v. State University of New York*, 127 F.Supp.2d 333, 338 (N.D.N.Y.2000) (stating majority of courts hold that only recipient of federal funds may be subject to Title IX liability and not individual defendants) (citing *Niles v. Nelson*, 72 F.Supp.2d 13, 17 (N.D.N.Y.1999)); *Powers v. CSX Transp., Inc.*, 105 F.Supp.2d 1295, 1312 (S.D.Ala.2000) (stating actions against individual defendants are not supported by either Title VI or Title IX because individual defendants do not have a contractual relationship with the government) (citing *Davis*, 526 U.S. at 641, 119 S.Ct. 1661); *Smith v. Metropolitan Sch. Dist.*, 128 F.3d 1014, 1019–1020 (7th Cir.1997); *Kinman*, 171 F.3d at 611; *Lipsett*, 864 F.2d at 901; *School Admin. Dist. No. 19*, 66 F.Supp.2d at 59; *Petrone v. Cleveland State Univ.*, 993 F.Supp. 1119, 1125 (N.D.Ohio 1998); *Buckley v. Archdiocese of Rockville Centre*, 992 F.Supp. 586, 588 n. 3 (E.D.N.Y.1998); *Nelson v. Temple Univ.*, 920 F.Supp. 633, 636–37 (E.D.Pa.1996) 2000; *Pallett v. Palma*, 914 F.Supp. 1018, 1025 (S.D.N.Y. 1996), *rev'd on other grounds*, 119 F.3d 80 (2d Cir.1997); *Torres v. New York Univ.*, 1996 WL 15691 at *2 (S.D.N.Y.1996); *Doe v. School Admin. Dist. No. 19*, 66 F.Supp.2d 57, 62 (D.Me.1999) (stating a cause of action under Title IX will lie only against recipients of federal funds and not against individuals); *Burrow v. Postville Cmty. Sch. Dist.*, 929 F.Supp. 1193, (N.D.Iowa 1996) ("[A] damage remedy under Title IX is only available against an 'education program or activity receiving Federal financial assistance,' not against individuals.") (citing *Lillard v. Shelby County Bd. of Educ.*, 76 F.3d 716, 730 (6th Cir.1996)); *Lipsett*, 864 F.2d at 901; *Nelson v. Temple Univ.*, 920 F.Supp. 633, 635–38 (E.D.Pa.1996); *Clay v. Board of Trustees of Neosho County Cmty. College*, 905 F.Supp. 1488, 1495 (D.Kan.1995); *Leija v. Canutillo Sch. Dist.*, 887 F.Supp. 947, 952 (W.D.Tex.1995); *Garza v. Galena Park Indep. Sch. Dist.*, 914 F.Supp. 1437, 1438 (S.D.Tex.1994); *Seamons v. Snow*, 864 F.Supp. 1111, 1116 (D.Utah 1994), *aff'd on other grounds*, 84 F.3d 1226 (10th Cir.1996); *Doe v. Petaluma City Sch. Dist.*, 830 F.Supp. 1560, 1576–77 (N.D.Cal. 1993); *Bougher v. University of Pittsburgh*, 713 F.Supp. 139, 143 (W.D.Pa.), *aff'd on other grounds*, 882 F.2d 74 (3d Cir.1989); *Clay v. Board of Trustees of Neosho County Cmty. College*, 905 F.Supp. 1488, 1495–96 (D.Kan.1995) ("Title IX actions may only be brought against an educational institution, not an individual acting as an administrator or employee for the institution.") (citing *Doe v. Petaluma*, 830 F.Supp. 1560, 1576–77 (N.D.Cal.1993); *Lipsett v. University of Puerto Rico*, 864 F.2d 881, 901 (1st Cir.1988); *Bowers v. Baylor Univ.*, 862 F.Supp. 142, 145–46 (W.D.Tex.1994); *Bougher v. University of Pittsburgh*, 713 F.Supp. 139, 143 (W.D.Pa. 1989), *aff'd*, 882 F.2d 74 (3d Cir.1989)). Thus, unlike the enforcement scheme of section 1983, individual wrongdoers do not face the possibility of large damages awards under Title IX.

In *Canty v. Old Rochester Regional School District*, 54 F.Supp.2d 66 (D.Mass. 1999), a district court in the District of Massachusetts similarly undertook the unenviable task of determining whether punitive damages are available under Title IX against a municipal entity. In *Canty*, the court held that "the sweeping language of *Franklin* to allow 'all available remedies' and the demonstrated reluctance of courts in this Circuit to offer municipal immunity

in similar circumstances prompts this Court to reject municipal immunity from punitive damages under Title IX." *Id.* at 70. Schultzen cites the *Canty* decision in support of her resistance to the school district's motion to dismiss and urges this court to adopt the *Canty* court's reasoning. However, the *Canty* court adopts the "sweeping approach" of *Franklin* and, in the process, appears to conclude, albeit implicitly, that *Franklin*'s tradition of the availability of all remedies trumps *Newport*'s tradition of municipal immunity from punitive damages, which is an implication this court cannot adopt.

### f. Step one: Newport *as the starting point*

■ In this burgeoning area of the law, there is no groomed trail upon which to proceed; however, this court's analysis must begin with *Newport* because the principles derived from *Newport* are applicable to this case. *Cf. Doe v. County of Centre,* 242 F.3d 437, 456 (3d Cir.2001) (holding that "[t]he principles derived from *City of Newport* are directly applicable to the present [Title II of the ADA and Section 504] case"). When Congress enacted Title IX, Congress presumptively knew of the common-law rule precluding punitive damages against municipalities. Had Congress intended to abandon the rule, it would have so provided, which it did not. *See Newport,* 453 U.S. at 259–60, 101 S.Ct. 2748. Thus, under the framework established in *Newport,* the common-law rule precluding punitive damages against municipalities was automatically incorporated into Title IX. *See id.* That is, of course, unless public policy dictates a contrary result. *See id.*

### g. Step two: Public policy considerations

The *Newport* Court also discussed the purposes of punitive damages and acknowledged that public policy consider-

ations might dictate a divergence from the common-law presumption of municipal immunity, even if Congress did not expressly so provide. *See id.* at 266, 101 S.Ct. 2748. After exploring several public policy considerations, which this court discussed above, the Court determined that they did not dictate a contrary result with respect to punitive damages against municipalities under section 1983. *See id.* at 266–71, 101 S.Ct. 2748. The Court held that the purposes underlying section 1983 could be served without the imposition of punitive damages against municipalities. *See id.* The purposes the Court identified are: (1) punishment, (2) compensation, and (3) deterrence. *Id.* at 268, 101 S.Ct. 2748. However, the Court emphasized that deterrence is the prominent purpose under the statute. *See id.* at 267–70, 101 S.Ct. 2748. Nevertheless, the Court concluded that "the deterrence rational of § 1983 does not justify making punitive damages available against municipalities." *Id.* at 268, 101 S.Ct. 2748.

Like section 1983, Title IX seeks to deter discrimination based on sex. *See Cannon,* 441 U.S. at 704, 99 S.Ct. 1946. However, Title IX also seeks to eliminate gender discrimination in education on an institution-wide basis. *See id.* In *Gebser v. Lago Vista Independent School District,* 524 U.S. 274, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998), the Supreme Court addressed whether a school district could properly be held liable for a private cause of action under Title IX for the misconduct of an individual teacher. The Court held that "damages may not be recovered [for the sexual harassment of a student by one of the district's teachers] unless an official of the school district who at a minimum has authority to institute corrective measures on the district's behalf has actual notice of, and is deliberately. indifferent to, the teacher's misconduct." *Id.* at 277, 118 S.Ct. 1989.

■ Relevant to this motion to dismiss, however, is the *Gebser* Court's thorough disquisition of the purposes of Title IX. "Congress enacted Title IX in 1972 with two principal objectives in mind: '[T]o avoid the use of federal resources to support discriminatory practices' and 'to provide individual citizens effective protection against those practices.'" *Id.* at 286, 118 S.Ct. 1989 (quoting *Cannon,* 441 U.S. at 704, 99 S.Ct. 1946) (alteration provided by *Gebser* Court). Moreover, unlike Title VII, whose primary goal is to compensate victims of sexual discrimination, Title IX's aim is broader and, arguably, more farsighted: "Title IX focuses more on 'protecting' individuals from discriminatory practices carried out by recipients of federal funds." *Id.* at 287, 118 S.Ct. 1989 (citing *Cannon,* 441 U.S. at 704, 99 S.Ct. 1946).

■ Recognizing that there are different purposes underlying Title IX and section 1983, the question becomes whether these differences are pronounced enough to disturb the common-law tradition of municipal immunity that undeniably exists in the context of section 1983. In *Newport,* the Court held that punitive damages were not available against a municipality under section 1983 because it was unclear whether offending officials would be deterred by the threat of a large punitive damages award against their employers. *Newport,* 453 U.S. at 268–69, 101 S.Ct. 2748. Under Title IX, school districts are only subject to liability for their own wrongdoing. *See Gebser,* 524 U.S. at 277, 118 S.Ct. 1989; *Davis,* 526 U.S. at 633, 119 S.Ct. 1661. Because of the contractual nature of Title IX, federal funding recipients cannot be held liable for teacher-student, *Gebser,* 524 U.S. at 277, 118 S.Ct. 1989, or student-on-student, *Davis,* 526 U.S. at 633, 119 S.Ct. 1661, sexual harassment absent actual notice and deliberate indifference on the part of the recipient. Similarly,

[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.

*Monell v. Department of Social Servs. of City of New York,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

The *Newport* Court determined that the availability of punitive damages against individual wrongdoers was a more effective means of preventing future abuses of power under color of state law than the threat of such an award against a municipality would be. *Newport,* 453 U.S. at 269, 101 S.Ct. 2748. The Court reasoned:

By allowing juries and courts to assess punitive damages in appropriate circumstances against the offending official, based on his personal financial resources, the statute directly advances the public's interest in preventing repeated constitutional deprivations.... [T]his provides sufficient protection against the prospect that a public official may commit recurrent constitutional violations by reason of his office.... [A] damages remedy recoverable against individuals is more effective as a deterrent than the threat of damages against a government employer. *Carlson v. Green,* 446 U.S. [14], at 21, 100 S.Ct. [1468], at 1473, 64 L.Ed.2d 15 [ (1980) ]. We see no reason to depart from that conclusion here, especially since the imposition of additional penalties would most likely fall upon the citizen-taxpayer.

*Id.* at 269–70, 101 S.Ct. 2748 (footnote omitted).

Conversely, the public's interest in preventing future discriminatory conduct in educational institutions may not be capable of full realization under Title IX without the imposition of punitive damages against municipal entities because individual offending officials are not, in their individual capacities, subject to Title IX liability. *See* string citation, *supra*, Section II.B.3.e. While section 902 of Title IX provides for the punishment of offending institutions by establishing a procedure for the termination of federal financial support for violations of the protections afforded by Title IX, that is an extreme remedy and is rarely imposed. *See Cannon*, 441 U.S. at 704–705, 99 S.Ct. 1946 (stating that the termination of federal funds is "severe and often may not provide an appropriate means of accomplishing the . . . purpose [or providing individual citizens effective protection against discriminatory practices] if merely an isolated violation has occurred."). Further, the termination of funds is not the exclusive remedy: The Supreme Court has recognized a private cause of action under Title IX. *See Cannon*, 441 U.S. at 717, 99 S.Ct. 1946. Thus, the Court has held that Congress did not intend that the sole means of accomplishing the purposes of Title IX would proceed through the termination of federal funds. *See id.* In addition, the termination of

federal financial support necessarily entails bureaucratic delay, which will forestall the vindication that victims of discriminatory practices seek.[9]

Moreover, by providing for the recovery of attorney's fees under section 1988 of *The Civil Rights Attorney's Fees Awards Act of 1976, as amended* 42 U.S.C. § 1988,[10] Congress indicated its intent that private citizens play a pivotal role in implementing congressional policy. *See* S.Rep. No. 94–1101, p. 2 (1976); U.S.Code Cong. & Admin. News (1976), pp. 5908, 5910 ("All of these civil rights laws [referenced in § 1988] depend heavily upon private enforcement, and fee awards have proved an essential remedy if private citizens are to have a meaningful opportunity to vindicate the important Congressional policies which these laws contain."); *accord* 20 U.S.C. § 1617 (providing fees to litigants "other than the United States" who secure judicial relief against certain defendants for discrimination in violation of Title VI). Because Title IX's administrative enforcement scheme includes the threat of a hefty blow to a school's finances by way of the termination of federal funding, private citizens acting as private attorneys general enforcing their rights under Title IX would not be fully effective without having the same power to threaten a financial setback

9. For example, the Department of Health, Education, and Welfare ("HEW"), which is charged with administering Title IX, candidly admitted in its submissions to the *Cannon* Court that it lacks the resources to enforce Title IX in a substantial number of circumstances. *Cannon*, 441 U.S. at 706–07 n. 42, 99 S.Ct. 1946. In its Reply Brief, the federal respondents stated:

"As a practical matter, HEW cannot hope to police all federally funded education programs, and even if administrative enforcement were always feasible, it often might not redress individual injuries. An implied private right of action is necessary to ensure that the fundamental purpose of Title IX, the elimination of sex discrimination in

federally funded education programs, is achieved."

*Id.* at 707 n. 42, 99 S.Ct. 1946 (quoting Federal Respondents' Reply Br., at 6) (citing 40 Fed.Reg. 24148–24159 (1975)).

10. Section 1988 provides, in relevant part:

In any action or proceeding to enforce a provision of section 1981, 1982, 1983, 1985, and 1986 of this title, title IX, or in any civil action or proceedings, by or on behalf of the United States of America, . . . or title VI of the Civil Rights Act of 1964 . . . the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs. 42 U.S.C. § 1988.

by way of the imposition of punitive damages.

While the scant legislative history of Title IX provides little guidance with respect to the issue of an award of punitive damages against a municipality, a negative inference can be drawn from the Civil Rights Act of 1991, Pub.L. No. 102–166, 105 Stat. 1071 (1991) ("The Civil Rights Act of 1991"). This act allows for an award of punitive damages against individuals and private entities in intentional discrimination suits brought under Title VII, Title I of the ADA, and certain sections the Rehabilitation Act. *Id.* However, the act expressly exempts municipalities and other governmental entities from such awards. *See id.*

Under the *Newport* and *Franklin* frameworks, Congress is presumed to have known that sections of the Rehabilitation Act had been interpreted along the same lines as Title VI and Title IX. By expressly limiting punitive awards in the context of this analogous statute, while not limiting the remedies available under either Title VI or Title IX, it would not be illogical to conclude that Congress intended to prohibit punitive damages against municipalities under Title VII, Title I of ADA, and sections 501 and 505 of the Rehabilitation Act but *not* under the other civil rights acts, including Title IX. Of course, the opposite inference could be drawn as well. In fact, the Third Circuit in *Doe v. County of Centre, PA*, 242 F.3d 437, 457 (3d Cir. 2001), explicitly refused to "draw such a broad inference of congressional intent" in the context of Title II of the ADA. This court agrees that it could conceive of a myriad of explanations to account for the "lack of amendment" to Title IX, but that is not to say that this negative inference is invalid or implausible.

Punitive damages are an effective means of deterring future violations of law. *See Newport*, 453 U.S. at 266–67, 101 S.Ct. 2748 (citing Restatement (Second) Of Torts § 908 (1979)). "The purposes of awarding punitive damages, or 'exemplary' damages as they are frequently called, are to punish the person doing the wrongful act and to discourage him and others from similar conduct in the future." Restatement (Second) Of Torts § 908 cmt. a. While the Court in *Carlson* held that punitive damages against individual offending officials were a more effective means of preventing future abuses of power, *Carlson*, 446 U.S. at 21, 100 S.Ct. 1468, that means of deterrence is unavailable under Title IX. *See* string citation, *supra*, Section II.B.3.e. Given Title IX's tremendous emphasis on deterring discrimination in educational institutions that receive federal funding and given that its primary purpose is eradicating such discriminatory practices, public policy arguably dictates a divergence from the traditional presumption that municipalities are immune from awards of punitive damages. *See Newport*, 453 U.S. at 266, 101 S.Ct. 2748.

**h. Newport *as the ending point***

Nevertheless, there are compelling reasons why the traditional rule immunizing municipalities from punitive damages awards prevents their imposition against a school district under Title IX. In *Newport*, the Court stressed that the cost of an award of punitive damages would be shouldered by the taxpayers, which is nonsensical in light of the fact that the citizen-taxpayers are the very people intended to be protected by section 1983. *See Newport*, 453 U.S. at 263, 101 S.Ct. 2748. The Court explained that punitive damages are intended to punish the wrongdoer and to deter future abuses of power. *Id.* at 267, 101 S.Ct. 2748. However, a municipality can act only through its officials; thus, an award of punitive damages against a municipal entity could not, by definition, further the retributive-deterrent purposes of

exemplary damages because "[a] municipality ... can have no malice independent of the malice of its officials." *Id.* Such an award, instead, would punish "only the taxpayers [through an increase in taxes or a reduction in public services] who took no part in the commission of the tort." *Id.* Thus, the Court held that, while municipalities properly share an obligation of *compensation* under section 1983, punishment should only be imposed against the wrongdoing officials. *Id.* at 263, 101 S.Ct. 2748.

Courts' treatment of punitive damages awards under other federal statutes supports the proposition that punitive damages are unavailable under Title IX. In *Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000), the Court addressed the issue of whether a state was a "person" for purposes of *qui tam* liability under the False Claims Act. Holding that it was not, the Court reasoned, *inter alia*, that mandatory treble damages under the False Claims Act are essentially punitive in nature and their imposition "would be inconsistent with state *qui tam* liability in light of the presumption against imposition of punitive damages on governmental entities." *Id.* at 784–85, 120 S.Ct. 1858 (citing *Newport*, 453 U.S. at 262–63, 101 S.Ct. 2748).

Similarly, the Third Circuit Court of Appeals recently held that municipalities are not amenable to suit under the False Claims Act because the Act mandates treble damages, which are punitive in nature. *United States ex rel. Dunleavy v. County of Delaware*, 279 F.3d 219, 222 (3d Cir. 2002) (citing *Stevens*, 529 U.S. at 784, 120 S.Ct. 1858; and *United States ex rel. Garibaldi v. Orleans Parish Sch. Bd.*, 244 F.3d 486, 491 n. 5 (5th Cir.2001)). Because the municipality is immune from their imposition, the treble damages scheme of the Act served to exempt municipalities from being subject to suit under the Act. *Id.* at 226.

The Fifth Circuit Court of Appeals reached a similar conclusion in *United States ex rel. Garibaldi v. Orleans Parish School Board*, 244 F.3d 486 (5th Cir.2001). In *Garibaldi*, the court reasoned:

The False Claims Act imposes punitive damages on those who violate it. This is contrary to the well-settled presumption that governments, including local governments, are not subject to punitive damages. *Stevens*, 120 S.Ct. at 1869; *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 259–271, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981). As the Supreme Court has held, imposing punitive damages on local governments is ordinarily contrary to sound public policy. *Id.* at 263, 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616. Though a local government can properly be made to pay compensation for the wrongful acts of its agents, punishing a local government is pointless. The punishment, in the form of higher taxes or reduced public services, is visited upon the blameless. Neither the taxpayers nor the schoolchildren of Orleans Parish played any role in the conduct giving rise to the School Board's liability. Extracting damages from them—damages that are far more than is needed to compensate the federal government for whatever losses it has suffered—is supported, as the Supreme Court has held, by, "[n]either reason nor justice." *Id.* at 267, 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616.

*Id.* at 491–92 (footnote omitted).

One week prior to the Third Circuit's decision in *Dunleavy*, however, the Seventh Circuit addressed the same issue in *United States ex rel. Chandler v. Cook County, Illinois*, 277 F.3d 969 (7th Cir. 2002), and held that counties were amendable to suit under the False Claims Act despite the common-law tradition immunizing municipalities from punitive damages.

In *Chandler*, the court focused on the 1986 amendments to the Act and found that Congress intended to include counties within the statute's definition of "person." *Id.* at 975. In an extremely well-reasoned opinion, the court distinguished the remedial scheme of the False Claims Act from section 1983 and found that their differences warranted a departure from the common-law tradition. *See id.* at 977–79. In particular, the court stated that, in the context of the False Claims Act, the taxpayers benefitted from the monies taken through the municipality's false claims against the federal government; hence, the prospect of punishing taxpayers through increased taxes would not be wholly unjust. *Id.* at 978. Moreover, unlike section 1983, Congress expressly provided for remedies for all violations of the Act. *Id.* Thus, the Supreme Court's concern in *Newport* that local government's would be subject to the whimsy of juries' "broad discretion" in assessing punitive damages was inapposite to damages under the False Claims Act, because damages under the False Claims Act were fixed by statute. *Id.* In sum, the Seventh Circuit held:

> Billions of dollars flow from the federal government to municipalities each year. Congress, in creating, in 1863, and then strengthening, in 1986, a comprehensive mechanism designed to remedy fraud against the federal government clearly determined that recipients of federal funds must be subject to such a deterrent. Given this legislative judgment, municipalities' common-law immunity from suit is inconsistent with Congress' purpose in adopting the FCA. Unlike § 1983, which creates a cause of action without specifying a remedy, the FCA includes a carefully crafted remedy for violations. Accordingly, despite the presumption against the imposition of punitive damages on municipalities, it is clear that Congress, in enacting the 1986 changes to the FCA, made a conscious choice to increase the recoverable damages while in no way indicating that it wished to exempt municipalities. Therefore, the interpretive presumption has been overcome.

*Id.* at 979.

This court need not address the disjoint between the Seventh Circuit's decision in *Chandler* with the Third and Fifth Circuits' decisions in *Dunleavy* and *Garibaldi*, respectively, because the differences noted in *Chandler* are not present in the context of Title IX. Under Title IX, the private cause of action is an implied one. *Cannon*, 441 U.S. at 717, 99 S.Ct. 1946. As such, there is no legislative history to illuminate congressional intent with respect to remedies, and Title IX provides no express remedial scheme that would quell the concerns identified by the *Newport* Court, including the fears associated with assessing punitive damages against the "deep pockets" of local governments. *See Newport*, 453 U.S. at 269–70, 101 S.Ct. 2748.

Furthermore, this court performed an exhaustive search and yet was unable to find any court of appeals decisions, with the exception of the Seventh Circuit's recent decision in *Chandler*, authorizing an award of punitive damages against a municipality, absent express statutory authority to do so. *See, e.g., Dunleavy*, 279 F.3d 219, 226 (municipalities immune from treble damages under False Claims Act); *Garibaldi*, 244 F.3d at 492 (same); *Doe*, 242 F.3d at 454 (municipal entities immune from punitive damages under section 504 of the Rehabilitation Act); *Genty v. Resolution Trust Corp.*, 937 F.2d 899, 914 (3d Cir.1991) (municipal entities immune from punitive damages under Racketeer Influenced and Corrupt Organizations ("RICO") Act); *Bell v. City of Milwaukee*, 746 F.2d 1205, 1270 (7th Cir.1984) (*New-*

*port* rule applied to suits against municipalities under sections 1981 and 1985).

And while the *Chandler* court held that municipalities were subject to suit under the False Claims Act, the legislative history and the purpose of the statute strongly supported the court's interpretation of the Act. *See Chandler,* 277 F.3d at 977–79 (exploring legislative history and purpose of Act and finding Congress intended municipalities to be subject to the False Claims Act).

In light of the well-settled presumption of municipal immunity from punitive damages and the absence of any indicia of congressional intent to the contrary, the court finds that punitive damages are unavailable against local governmental entities under Title IX. While there are bona fide reasons to deviate from this traditional presumption, *see discussion, supra,* Section II.B.3.g, these reasons are not strong enough to disturb municipalities' common-law immunity. Accordingly, the court will grant the School District's motion to dismiss Schultzen's claim for punitive damages under Count I of her complaint.

### III. CONCLUSION

THEREFORE, for the reasons stated above, the court **grants** the school district's motion to dismiss Schultzen's punitive damages claims under **Counts I (Title IX), II (section 1983), and III (Chapter 216)** because municipal entities are immune from such damages under these causes of action.[11]

**IT IS SO ORDERED.**

---

11. The school district also requested oral arguments on its motion to dismiss. Because this motion presents a purely legal issue, it is the court's opinion that oral arguments would not be beneficial. Therefore, the court denies the school district's request.